IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| WILLOW KELLY,<br>　　　Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY,<br>　　　Defendant. | Civil Action No. 5:15-cv-00075<br><br>MEMORANDUM OPINION<br><br><br>By:　Joel C. Hoppe<br>United States Magistrate Judge |

Plaintiff Willow Kelly asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that substantial evidence supports the Commissioner's decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through

2

four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Kelly filed for DIB on October 20, 2012, alleging disability beginning on August 1, 2006, at which time she was forty-three years old, caused by recurrence of chronic Lyme disease and co-infections; debilitating fatigue, exhaustion, and "air hunger"; joint and nerve pain in hips, hands, and feet (severe); stabbing pains and facial tic; insomnia and drenching night sweats; restless leg syndrome; depression and anxiety; dizziness, lightheadedness, and weakness; nausea, vomiting, acid reflux, and appetite and weight loss; blurred vision and large floater; and involuntary eye and head movements. Administrative Record ("R.") 89–90, ECF No. 12. Disability Determination Services ("DDS"), the state agency, denied her claim at the initial, R. 89–103, and reconsideration, R. 105–17, stages. On March 27, 2015, Kelly appeared with counsel at an administrative hearing before ALJ H. Munday and testified about her impairments, past work, and daily activities. R. 42–88. A vocational expert also appeared and testified about Kelly's past work and her ability to do other jobs in the national economy. R. 81–87.

On April 23, 2015, ALJ Munday issued a written decision denying Kelly's DIB application. R. 19–32. The ALJ determined that Kelly met the insured status requirements under DIB through December 31, 2011, her date last insured ("DLI"). R. 21. ALJ Munday focused her inquiry on whether Kelly was disabled between the alleged onset date and the DLI. R. 21, 32. She determined that Kelly had severe impairments of Lyme disease, osteoarthritis, affective disorder, and anxiety disorder, but found all of her other conditions, including her history of psoriasis and her throat issues, to be non-severe. R. 21–22. She found that none of these impairments met or medically equaled the severity of one of the listed impairments. R. 22–23.

3

As to Kelly's residual functional capacity ("RFC"),[1] ALJ Munday determined that she could perform light work[2] except that she required a sit/stand option every thirty minutes, if needed, while on task. R. 24. Additionally, she could frequently balance and stoop; occasionally kneel, crouch, crawl, and climb; frequently finger; occasionally be exposed to vibrations and hazardous conditions such as unprotected heights and moving machinery; frequently interact with the general public and supervisors; and perform simple, routine tasks. *Id.* Kelly could not perform any of her past relevant work. R. 31. She could, however, perform other light jobs, including non-postal mail clerk, marker, and counter clerk, that existed in significant numbers in the national economy. R. 31–32. Therefore, ALJ Munday concluded that Kelly was not disabled from her alleged onset date of August 1, 2006, through her DLI of December 31, 2011. R. 32. The Appeals Council denied Kelly's request for review, R. 1–3, and this appeal followed.

III. Discussion

Kelly initially asserted that ALJ Munday inadequately explained the basis for discounting her credibility concerning the description of her symptoms, improperly relied on the six-year gap between the alleged onset date and filing for DIB to question her credibility, and erroneously disregarded her testimony that she pursued alternative medical care during much of the relevant period. Pl. Br. 5–22, ECF No. 15. At oral argument before this Court, however, she withdrew these arguments and opted to proceed on the sole basis that the ALJ erred by not considering the medical evidence in the record from after her DLI, which she contends shows she suffered from

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

disabling symptoms of Lyme disease as of November 2011. Pl. Suppl. Br. 1, ECF No. 24. For the following reasons, I find that Kelly's argument is not persuasive.

A.  *Kelly's Submissions and Testimony*

During the administrative hearing, Kelly testified about her impairments and functioning during the relevant period. After Kelly underwent antibiotic treatment for Lyme disease in 2000 in California, a doctor told her she would never fully recover. R. 56. Kelly subsequently moved to Virginia and worked a variety of jobs. R. 46–50. When she could no longer work, she became overwhelmed with depression. R. 47–48. Near the end of her employment with an attorney, she began seeking out alternative medicine for her ailments, trying tinctures and herbs because the antibiotics were not working. R. 58–59. She also tried chiropractic treatment, holistic medicine, massage, diet changes, over-the-counter medication, ice and heat, and baths. R. 59–60. Throughout this time, she had pain in her hands, legs, hips, and feet, but not until 2011 when she started to experience sharp joint and nerve pain did she seek conventional medical treatment in the form of narcotic therapy, R. 59, 61–62. Kelly also received a steroid injection in September 2011, which she described as a "really weird experience," as she had a bad reaction to the shot, including inflammation and searing pain down her leg. R. 74.

As to her activities during this time, Kelly would get out of bed and get dressed, but then would lie down for about an hour. R. 62. On a regular day, she would lie down three more times, but on a bad day she would lie down once or twice and not be able to get back up. R. 63. She also worked as a workshop facilitator, managing the events and teaching emotional healing all over the country, but mostly on the West Coast, for about eight to nine weeks per year. R. 50–51. Although these trips involved extensive travel, Kelly managed by flying out early to give herself a few days to recover before starting; when returning home, however, she needed anywhere from

one to three weeks to recover fully, depending on the length of the trip. R. 60. She also used a lot of pain medication, stretching, and an upright sleeper to make it through the flights. R. 78–79. She last conducted workshops in 2009, although she volunteered for one in 2014 and had to direct everything from bed. R. 67–68. Kelly also infrequently performed as a singer as a hobby despite having performance anxiety, but stopped in 2009. R. 52, 68–69. She spent most of her time "horizontal" and never did anything as a single individual, always requiring a partner or teammate to help her if needed. R. 71. She drove about three to four times per week to pick up pet supplies and attempt to jumpstart her and her husband's businesses, but had not done a big road trip in a long time. R. 78. Her condition had worsened since 2006, and she started using a cane in late 2011. R. 73.

  Kelly also completed one function report as part of her DIB application. R. 209–16. She again described a very minimal daily routine involving eating enough to take her medicine and doing a few essential household tasks if she felt up to it. R. 209. She struggled with personal care and did not get dressed unless she planned to leave the house, R. 210, which she did only to go out for medical appointments, R. 212. She no longer prepared meals except to get herself a small snack and did little to no house or yard work. R. 211. She had no hobbies, interacted with others when they came over, and communicated via email. R. 213. Her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember things, complete tasks, concentrate, follow instructions, and use her hands. R. 214. She could walk only as far as across the street before needing to rest, could pay attention for twenty to thirty minutes, and did not finish what she started. *Id.* She used a cane, although it was not prescribed by a doctor. R. 215. Her husband completed a third party function report in which he confirmed her claims,

6

particularly her minimal daily routine and that he takes care of most things around the house. R. 232–39.

B.   Analysis

   1.   Credibility

Although Kelly withdrew her challenge to ALJ Munday's credibility analysis, the ALJ's reasoning on this issue provides necessary context for Kelly's sole remaining argument. The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[3] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a)–(b); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects her physical or mental ability to work. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig,* 76 F.3d at 595.

The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). Nonetheless, a claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to

---

[3] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 404.1528(a).

7

cause the pain the claimant alleges she suffers." *Craig*, 76 F.3d at 595.[4] The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the objective medical evidence, *id.* (citing 20 C.F.R. § 404.1529(c), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements, *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013).

ALJ Munday explained why she did not find Kelly's allegations credible, a conclusion which Kelly conceded at oral argument, at least as to the evidence preceding her alleged exacerbation of Lyme disease symptoms in late 2011. Despite finding that Kelly's medically determinable impairments could cause her alleged symptoms, the ALJ determined that her credibility as to the severity of her symptoms was undermined by limited findings on physical and mental examinations; generally routine, conservative, and infrequent treatment; her failure to take medication as directed; a lack of mental health complaints and treatment; the length of time between alleging disability and filing an application; and her inconsistent activities and statements. R. 24–30.

Substantial evidence supports the ALJ's factual findings and reasoning. The ALJ noted that despite seeing a chiropractor throughout the relevant period, Kelly rarely complained of Lyme disease. R. 29; *see also* R. 361–62, 415–17. She was diagnosed with osteoarthritis in May

---

[4] The Social Security Administration now cautions that the subjective prong of this analysis should not be approached with an undue focus on the claimant's "credibility." *See* SSR 16-3p, 2016 WL 1119029, at *1. The scope of this inquiry should be limited to those matters concerning the claimant's symptoms, rather than other factors that might otherwise be probative of the claimant's overall honesty. *Id.* at *10. "In evaluating an individual's symptoms, [ALJs] will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Id.* Statements that are internally inconsistent or that are inconsistent with the other evidence of record, however, may lead the ALJ to "determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* at *7.

2008, R. 29 (citing R. 377), but did not seek treatment again until December 2009,[5] at which time she had 5/5 strength and mild situational anxiety, *id.* (citing R. 513–14). She had no treatment in 2010 and reported left foot pain in April 2011, *id.* (citing R. 510–11), neck and left shoulder pain in July 2011, *id.* (citing R. 362), and right hip and knee pain in September 2011, at which time she had full strength and sensation and no instability, *id.* (citing R. 366–68). Kelly did have some tissue swelling in November 2011, but it resolved by December 2011, and she did not take nonsteroidal anti-inflammatory medication as recommended. *Id.* (citing R. 369–72). Kelly did not see a mental health professional until August 2011, and except for having depressed mood and affect, findings on examination were normal. *Id.* (citing R. 625–27).

ALJ Munday also explained that Kelly provided conflicting statements regarding her conditions, and she engaged in extensive activities that were inconsistent with her allegations of complete disability. R. 29–30. Kelly claims that she spent most of her time during the relevant period "horizontal." *See supra* Pt. III.A. The ALJ, however, cited conduct from both during and shortly after the relevant period that was inconsistent with her reports of debilitating symptoms. R. 29–30. For example, Kelly did a lot of singing in August 2007, R. 29 (citing R. 378), and reported working as a singer/musician and speaking as a consultant, which increased demands on her vocal cords, in September 2007, *id.* (citing R. 575). She traveled in July 2008, *id.* (citing R. 362), and flew to Europe in August 2008, *id.* (citing R. 455). In December 2009, she was employed as a performance artist and had been conducting workshops and speaking engagements concerning the environmental green movement. *Id.* (citing R. 513–14). She reported playing music and teaching personal development in February 2011, R. 29–30 (citing R. 354), and did public speaking and held workshops in April 2011, R. 30 (citing R. 510). After her

---

[5] In making this finding, ALJ Munday overlooks two of Kelly's visits to her chiropractor in May and November 2009. *See* R. 414, 421. This error does not significantly detract from the ALJ's credibility assessment because these visits revealed normal findings.

9

DLI in April 2012, she continued to exercise regularly, do volunteer work, and engaged in public speaking in workshops. *Id.* (citing R. 508). She traveled to Germany for a month in June 2012, *id.* (citing R. 599), and reported in August 2012 that she would be traveling for six weeks, *id.* (citing R. 597). In March 2013, she traveled to Australia to teach at a conference, *id.* (citing R. 754), and offered conflicting accounts of her trip, *id.* (*compare* R. 758 (reporting to medical providers that her travel was great), *with* R. 724 (explaining to her attorney that she required extensive accommodations for the entire trip)).

Additional evidence in the record also supports the ALJ's findings. Shortly after her DLI, Kelly reported traveling significant distances for treatment, initially seeing a Lyme disease doctor in Maryland before finding one closer to home, R. 758, 784, and treating with a naturopath in Wisconsin, R. 589. In October 2012, she also stated that she had received multiple tick bites over the last three years while going camping in Virginia. R. 671. Simply put, Kelly's extensive activities undercut her claims regarding her functioning during the relevant period.[6] Therefore, the ALJ properly considered these discrepancies in evaluating Kelly's credibility, and his reasons for questioning the severity of her reported symptoms are supported by substantial evidence. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (finding no error where "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility and averred that the entire record had been reviewed"); *Sowers v. Colvin*, No. 4:12cv29, 2013 WL 3879682, at *4 (W.D. Va. July 26, 2013) (finding that the claimant's

---

[6] Kelly asserts that many of her statements to her physicians about her activities were exaggerations or puffery. Pl. Br. 8–10. While this assertion may be accurate, the record does not confirm it. Moreover, the ALJ provided an adequate explanation for crediting Kelly's contemporaneous statements to her physicians, which described significant activities, over her claims at the hearing of greater functional limitation.

10

inconsistent statements about his symptoms provided substantial support for ALJ's adverse credibility finding).

    2.    *Consideration of Evidence After the DLI*

Kelly argues that ALJ Munday erred by not considering the medical evidence from after her DLI, as she asserts that her Lyme disease manifested again in November 2011—one month before her DLI—causing disabling symptoms. To qualify for DIB, a claimant must prove that she was disabled before her DLI. *Bird v. Comm'r Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012); *Johnson v. Barnhart*, 434 F.3d 650, 655–56 (4th Cir. 2005). In doing so, a claimant may rely on medical evidence generated after the DLI. *See Bird*, 699 F.3d at 340 ("Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI."). Post-DLI evidence is generally admissible "in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition." *Id.* at 341; *cf. Potter v. Sec'y of Health and Human Servs.*, 905 F.2d 1346, 1348 (10th Cir. 1990) (per curiam) (citing *Millner v. Schweiker*, 725 F.2d 243, 246 (4th Cir. 1984)) ("It is true that a treating physician may provide a retrospective diagnosis of a claimant's condition."). That said, the relevant inquiry is "whether the claimant was actually *disabled* prior to the expiration of her insured status," and "[a] retrospective diagnosis without evidence of actual disability is insufficient." *Potter*, 905 F.2d at 1348–49 (citations omitted). Moreover, it is the role of the ALJ, and not the courts, "to weigh the medical evidence of record and determine if [it] support[s] a finding of disability during the relevant time period." *Whitlock v. Sullivan*, No. 89-00226-R, 1990 WL 357276, at *1 (E.D. Va. Jan. 16, 1990).

Shortly before her DLI,[7] Kelly presented to Gregory Hardigree, M.D., on September 30, 2011, with a right hip problem, which occurred without any known injury. R. 366. She also experienced some right knee pain. *Id.* Her symptoms were moderate in severity and worsening, exacerbated by weight bearing, and relieved by nonsteroidal anti-inflammatory drugs. *Id.* Dr. Hardigree assessed hip bursitis and administered a steroid injection in her hip. R. 367–68. Kelly returned to Dr. Hardigree on November 14 and reported that the injection did not help. R. 369. She also complained of right thigh pain in addition to her hip and knee pain during this visit. *Id.* Dr. Hardigree did not perform a physical exam and assessed hip and knee pain. R. 369–70. He also encouraged Kelly to take either Ibuprofen or Aleve regularly. R. 370. During a follow-up on December 5, Dr. Hardigree noted that Kelly had not been taking the anti-inflammatories as suggested. R. 372. As for her symptoms, the knot in the mid-right thigh had resolved, she had no swelling or tenderness at the knee, and lab work showed normal complete blood count and differential, but she had some swelling and stiffness in her fingers, persisting hip pain to palpation, and palpable subluxation of the tendons posterior to the tip of the greater trochanter. *Id.* Dr. Hardigree again recommended generic Aleve at the lowest effective dose and remarked that he would recheck lab work in a few weeks and consider referring Kelly to a rheumatologist if her symptoms persisted. *Id.* There is no evidence Kelly visited Dr. Hardigree again.

Kelly asserts that her Lyme disease never fully resolved after successful treatment with a PICC line in 2003, and that it gradually re-emerged in 2011, ultimately manifesting after the

---

[7] In her opening brief, Kelly attributes the lack of treatment records prior to September 2011 to her religious belief that she should not pursue traditional medicine to treat her impairments and symptoms. Pl. Br. 11, 16–17. To support this argument, Kelly cites a single, mostly illegible, treatment note. R. 866. A clearer version of this treatment note only indicates that she had attended "Witch Camps" in the past, but does not otherwise expound on either her religious beliefs or their influence on her treatment. *See* R. 691. As the claimant bears the burden of proving disability, this single note is no substitute for medical evidence of impairments causing functional limitation. Moreover, Kelly's argument is contradicted by her history of treatment with a chiropractor, R. 403–47, an internal medicine specialist, R.376–78, and an OB-GYN, R. 510–21, prior to September 2011.

unsuccessful hip injection in September 2011. Pl. Suppl. Br. 2–4. She claims the return of her Lyme disease became evident when she presented to Dr. Hardigree in November 2011 with rapidly changing symptoms and reported that the injection did not help. She identifies his desire to "check the markers of systemic inflammation" and order serological testing, *see* R. 370, as evidence that her Lyme disease had recurred at that time. Thus, she contends that the ALJ erred by disregarding treatment notes in the record from 2012 and later, Pl. Suppl. Br. 4, and that remand is necessary to determine whether she is entitled to a closed period of disability beginning in November 2011.[8]

Here, however, the ALJ could reasonably determine that the medical evidence did not show that Kelly's Lyme disease returned in November 2011. She argues that her "perception of returned symptoms [in 2011] is sufficient to place the return of her infection within the window of coverage," because "[m]ore than even the medical professionals, she understood what was happening to her." *Id.* at 4, 6. Kelly's self-diagnosis, without more, falters in light of ALJ Munday's credibility analysis, and it does not overcome the substantial evidence, in the form of her treating physicians' notes, that otherwise supports the ALJ's opinion. *Cf. Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (explaining that "[t]he Act provides that '[a]n individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof'" (quoting 42 U.S.C. § 423(d)(5)(A))); *Livesay v. Apfel*, 52 F. Supp. 2d 623, 626–27 (E.D. Va. 1998) (holding that the claimant did not meet his burden of proving disability prior to his DLI because the submitted medical evidence—although possibly supportive of his

---

[8] Kelly proffers that she returned to part-time work in 2016, and thus is seeking only a closed period of disability. Pl. Suppl. Br. 12. Because Kelly has not met her burden of demonstrating that she was disabled prior to her DLI, I do not discuss whether a closed period of disability is warranted.

subjective claim that he suffered from a "silent" heart attack in the past—did not establish that his condition arose or caused disability before the DLI).

The ALJ thoroughly recited the medical evidence through April 23, 2012, almost four months after Kelly's DLI, none of which showed that her Lyme disease had returned. *See* R. 26–28. Kelly did not have a positive test for Lyme disease until late 2012. She had four serological tests—in December 2011, R. 372, April 2012, R. 381, 386, May 2012, R. 630–34, and August 2012, R. 556–59, 564—that were all negative for or did not reveal a recurrence of Lyme disease. A positive test was obtained on October 5, 2012, R. 647, 995. The ALJ also noted that Kelly asked Dr. Hardigree in November 2011 whether her symptoms could be related to Lyme disease, but that Dr. Hardigree opined they appeared extra-articular.[9] R. 27–28. Kelly argues that without additional explanation from Dr. Hardigree, the ALJ could not properly rely on his medical conclusion. Pl. Suppl. Br. 4–5. I must disagree. Dr. Hardigree's conclusion comes at the end of a paragraph in which he recites the objective evidence of her symptoms, many of which had already resolved, R. 370, and Dr. Hardigree conducted a physical examination during Kelly's visit in September 2011, which showed minimal objective findings, R. 367. Additionally, Daniel Sawyer, M.D., an internal medicine and infectious diseases specialist whom Kelly had seen since at least 2003, indicated on April 10, 2012, that despite her subjective complaints, he doubted Lyme disease was the cause of her symptoms, and he did not include Lyme disease under his impressions on April 23, 2012. R. 374–75. The ALJ was not compelled to rely on Kelly's self-diagnosis over the assessments of her treating physicians.

---

[9] Extra-articular means "situated or occurring outside a joint." *Dorlands Illustrated Medical Dictionary* 663 (32d ed. 2012). Conversely, Lyme disease involves "highly variable manifestations that may include myalgia, arthritis of large joints, stiff neck, involvement of the nervous and cardiovascular systems, and systemic symptoms such as chills, fever, headache, malaise, and vomiting." *Id.* at 538.

More importantly, the record does not reveal any disabling symptoms or functional limitations present before or even shortly after the DLI. For example, Dr. Hardigree's physical examination from Kelly's initial visit in September 2011, which the ALJ discussed, showed full strength in the right hamstrings, quadriceps, and hip flexors; substantially normal range of motion, no instability, subluxation, or laxity, and normal sensation and coordination of the right hip; and negative straight leg raising test. R. 367. After the DLI, on February 7, 2012, notes from Kelly's chiropractor indicate that her passive and active ranges of motion were entirely normal except for a mild decrease in her right hip abduction and her right knee extension. R. 397–98. Her deep tendon reflexes, dermatomes, and muscle strength were also within normal limits, and Bechterew's, Kemp's, Patrick's, and straight leg raising tests were all negative. R. 398. On April 23, her chiropractor noted that she was responding favorably and tolerating treatment well. R. 387. On April 30, she treated with Lily Hargrove, M.D., for an initial visit. R. 606–07. Dr. Hargrove's physical exam revealed normal gait and no acute distress. *Id.* Kelly then saw Daniel Jaller, M.D., for an initial Lyme disease consultation on May 7. R. 662. Other than an eczematous patch on her left leg and elbow and decreased sensation to temperature and pinprick, the physical examination was generally normal, as she had no joint swelling, tenderness, or active signs of synovitis in her knees, wrists, or hands, and no clubbing, cyanosis, or edema in the extremities. R. 663. A follow-up visit to Dr. Hargrove on May 14 showed full range of motion in her hips bilaterally, no acute distress, and no musculoskeletal tenderness. R. 602. An X-ray of her hip was also normal, showing no arthritis or fracture. R. 601. Follow-ups with Dr. Jaller in June, R. 659–61, September, R. 657–58, and October, R. 655–56, likewise revealed limited abnormalities on physical examination.

To be sure, Dr. Jaller's treatment notes indicate that her symptoms worsened throughout 2012. During her initial consultation on May 7, she had pain in her hands and feet, numbness in her fingers and head, swelling in her fingers and toes, increased restless leg syndrome ("RLS"), intermittent night sweats, and fatigue. R. 683. On June 12, she reported improved night sweats and RLS, but still experienced joint pains, dizziness, fatigue, a little brain fog, and muscle spasms. R. 677. On September 5, she noted a wide range of symptoms including fatigue, malaise, night sweats, headaches, blurred vision, sensory changes, dysphagia, muscle and joint pains, joint swelling, neck pain, radiating shooting pains, numbness and tingling, muscle weakness, loss of balance, brain fog, irritability and anxiety, and facial tics. R. 657. On October 5, Kelly felt about 20% better since her last visit, R. 674, but by October 25, she had increased fatigue, dizziness, and brain fog; chills during the day; blurred vision; stabbing pain in her right temple; poor appetite; burning, shooting sensation in her hands, fingers, and feet; and most disabling of all, a feeling of not wanting to move at all with physical pain, R. 671.

Nevertheless, no entry in Dr. Jaller's notes expressly or implicitly links these symptoms and any resulting functional limitations to her condition prior to her DLI. *See Bird*, 699 F.3d at 341–42. In *Bird*, the Fourth Circuit held that the ALJ erred because despite not presenting any medical records from before his DLI, Bird's post-DLI evidence of a psychological examination conducted by the Department of Veterans Affairs, the evaluation of a licensed clinical psychologist, his own testimony, and a statement from his wife all corroborated the inference that Bird's symptoms of PTSD existed long before his DLI. *Id.* at 339–42. The only evidence in this case linking Kelly's functional limitations to the period before her DLI comes from her subjective perception of symptoms. Her self-diagnosis and subjective report of symptoms, when not confirmed by the medical evidence, does not provide persuasive grounds to overturn the

ALJ's analysis. ALJ Munday thoroughly recited the medical evidence through April 23, 2012, and she discussed Kelly's report to her physicians of her activities through March 2013. *See* R. 30. The ALJ explicitly found that her RFC assessment addressed Kelly's functioning through late 2011. R. 29. Treatment notes from Dr. Hardigree and Dr. Hargrove as well as the May 2012 notes from Dr. Jaller provide more than a scintilla of evidence to support the ALJ's RFC assessment. Thus, even if Kelly were correct that her Lyme disease had returned before the DLI, this would not undermine the ALJ's decision because the record does not show disabling symptoms and limitations stemming from her Lyme disease during the relevant period. *See Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991) (explaining that the ALJ and Appeals Council appropriately "recognized the need for some evidence of an actual disability during the period that [the] claimant maintained insured status," and that the post-DLI medical evidence and the claimant's subjective testimony were properly rejected "because [they were] not substantiated by evidence in the record pertinent to the insured period"). Therefore, the ALJ's analysis of the medical and other evidence in the record provides substantial evidence for her determination that Kelly is not disabled.

IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, the Court will **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 20, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: March 30, 2017

*signature*

Joel C. Hoppe
United States Magistrate Judge